**Gregory Schiller, Plaintiff–Appellant,**

Philippe DE VRIES, Julia Francis De Vries, Trust, Heather Faye Dunbar De Vries, Trust, on behalf of themselves and all others similarly situated, De Vries Family Trust, Trust, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

TOWER SEMICONDUCTOR LTD., Idan Ofer, Ehud Hillman, Eli Harari, N.D. Reddy, Miin Wu, Israel Corp., Israel Corporation Technologies Ltd., Sandisk Corporation, Macronix International, Alliance Semiconductor Corporation, Quicklogic Corporation, Challenge Fund–Etgar II, Defendants–Appellees.

Docket No. 04–5295–cv.

United States Court of Appeals, Second Circuit.

Argued: Sept. 15, 2005.

Last Papers Submitted: Feb. 3, 2006.

Decided: June 1, 2006.

Lawrence D. Levit (Jeffrey S. Abraham, on the brief), Abraham, Fruchter & Twersky, LLP, New York, NY; Mark D. Stern, P.C. Somerville, MA, for Plaintiff–Appellant.

Scott Musoff (Jay B. Kasner, Scott D. Musoff, on the brief), Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendants–Appellees Tower Semiconductor Ltd., Idan Ofer, Ehud Hillman, Eli Harari, N.D. Reddy, and Miin Wu.

Daniel L. Cantor (Michael R. Patrick, on the brief), O'Melveny & Myers LLP, New York, NY, for Defendants–Appellees Israel Corporation, Israel Corporation, Technologies Ltd., SanDisk Corporation and Alliance Semiconductor Corporation.

Douglas Clark, Wilson, Sonsini Goodrich & Rosati, P.C., Palo Alto, CA, for Defendant–Appellee QuickLogic Corporation.

Before: MINER, WESLEY, Circuit Judges, and RAKOFF, District Judge.[1]

WESLEY, Circuit Judge.

This case pits an old law against a "novel" argument.[2] Gregory Schiller ("Schiller") individually appeals the dismissal of a shareholder class action complaint filed against Tower Semiconductor Ltd. ("Tower"), its directors, and certain Tower investors. The complaint alleges that a Tower proxy statement issued by defendants was materially misleading and therefore violated §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t, and certain regulations, including Rule 14a–9, 17 C.F.R. § 240.14a–9 (2004) ("Rule 14a–9"). The United States District Court for the Southern District of New York (Wood, J.) dismissed the complaint on the ground that Tower, an Israeli corporation, was a foreign private issuer and therefore exempt from the strictures of § 14(a) by virtue of Exchange Act Rule 3a12–3, 17 C.F.R. § 240.3a12–3 (2004) ("Rule 3a12–3"). In so doing, the district court rejected the plaintiffs' claim that the Securities Exchange Commission ("SEC" or "the Commission") exceeded its authority in promulgating Rule 3a12–3. We affirm.

**Background**

As the facts of this case are not particularly relevant to the disposition of this appeal, we offer only those necessary to provide context to Schiller's claims. In the year 2000, Tower began to secure financing for the construction of a semiconductor fabrication facility ("Fab 2") in Israel. To this end, Tower entered into agreements with two sets of companies (collectively "Fab 2 Investors"), which agreed to provide Tower with approximately $305 million in financing in exchange for stock and credits toward the purchase of semiconductors. The agreements divided the total promised financing into installments and conditioned the payment of each installment upon the attainment of a different construction milestone. At the beginning of 2001, Tower further contracted with two Israeli banks to borrow $550 million for

---

1. The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

2. "Novel" is the adjective Judge Kimba Wood used to describe the issue that we are presented with here on appeal in her order dismissing the appellant's claims. *Philippe De Vries v. Tower Semiconductor Ltd.*, No. 03–civ–4999 (S.D.N.Y. August 19, 2004).

the construction project. This loan was conditioned on Tower's ability to comply with a timeline for raising $103 million in additional financing.

On March 31, 2002, Tower distributed a proxy statement disclosing that it was currently negotiating with the Israeli banks to reschedule the date by which it had to meet its next financing obligation. The proxy statement sought shareholder approval of a plan under which the Fab 2 Investors would accelerate certain installments of their $305 million commitment without regard to the attainment of the corresponding construction milestones in return for seven million shares of Tower stock. The proxy statement explained that once the installments were accelerated, the banks would postpone the date by which Tower had to meet its next financing obligation until the end of July 2002. Tower believed that the plan would "permit us to better pursue our efforts to bring strategic investors and to raise other funding."

While the plan received the necessary votes for approval, not all Tower shareholders were content with the arrangement. Schiller and others voiced their objection by filing a class action in the district court. The complaint alleged that Tower's proxy statement was false and misleading in violation of § 14(a) and Rule 14a–9 and that the Fab 2 Investors and certain members of Tower's board of directors, as control persons, were liable under § 20(a) of the Exchange Act, 15 U.S.C. § 78t. In particular, the complaint alleged that there was no need for the Fab 2 Investors to accelerate the installments of its $305 million commitment because the construction of Fab 2 was on schedule, and therefore it was expected that the construction milestones, upon which the installment payments were conditioned, would be attained. Further, Schiller and his fellow plaintiffs contended that "be-cause the Fab 2 project was proceeding on schedule, and because the [construction milestones] were going to be met in a timely manner, the advancement of the payment date had no value and was not a reason for the [b]anks to defer the dates by which additional financing needed to be obtained."

Defendants mounted a straightforward defense. They argued that Tower is a foreign private issuer and therefore that Rule 3a12–3 removes them from the reach of § 14(a). While plaintiffs contested defendants' characterization of Tower as a foreign private issuer, the district court easily dismissed this argument by pointing out that Tower's capital is located in Israel and that Tower's principal lenders are Israeli banks; the district court also relied on the fact that Tower had filed with the Commission annual reports reserved solely for foreign private issuers. As an alternative argument, plaintiffs challenged the validity of Rule 3a12–3, contending, as Schiller does on appeal, that Rule 3a12–3 exceeds the Commission's exemptive authority under the Exchange Act. The district court explained that "Congress has authorized the SEC to create certain exemptions through rules and regulations, so long as those exemptions are in the public interest and protect investors," and that it could not say that Rule 3a12–3 is "arbitrary, capricious, or manifestly contrary to the statute." We agree.

## Discussion

Section 14(a) of the Exchange Act bars the dissemination of proxy statements "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a). Rule 14a–9 provides that proxy statements are not to be "false or misleading with respect to any material

fact." 17 C.F.R. § 240.14a–9(a). By its own terms, however, § 14(a) does not apply to "exempted securit[ies]." Section 3(a)(12)(A)(vii) of the Exchange Act defines "exempted securit[ies]" as including

> such other securities ... as the Commission may, by such rules and regulations as it deems consistent with the public interest and the protection of investors, either unconditionally or upon specified terms and conditions or for stated periods, exempt from the operation of any one or more provisions of this chapter which by their terms do not apply to an "exempted security" or to "exempted securities."

The rule exempting foreign private issuers from § 14(a) is nearly as old as § 14(a) itself. The Commission originally promulgated Rule 3a12–3 in 1935, one year after Congress enacted the Exchange Act.[3] At that time, the only source for the SEC's authority to promulgate such a rule was the combined force of § 14(a) and § 3(a)(12)(A)(vii). Thus, when the Commission originally adopted Rule 3a12–3 in 1935, pursuant to its statutory mandate, it explicitly stated that it "deem[ed] it necessary and appropriate in the public interest and for the protection of investors" to adopt the exemption for foreign private issuers. SEC Rule AN 18, Exchange Act Release No. 412 (Nov. 6, 1935), 1935 WL 29303, at *1. It explained that at that time "there [were] relatively few stock issues of foreign issuers listed on American ex-

changes" and that "a realistic approach ha[d] led to the conclusion that the interests of American investors will be best served by the continuance of these exemptions." SEC Rule AN 18, Exchange Act Release No. 412 (Nov. 6, 1935), 1935 WL 29303, at *1.

In 1964, Congress amended the Exchange Act by adding § 12(g), which extended registration requirements to companies not listed on any exchange but whose assets and shareholders exceed in number certain statutory limitations. *See* Securities Acts Amendments of 1964, Pub.L. No. 88–467, § 2, 78 Stat. 565, 566–68 (1964) (codified at 15 U.S.C. § 78l(g)) ("1964 Amendments"). At the same time, Congress enacted § 12(h), which authorizes the SEC to create exemptions from a number of provisions of the Exchange Act, including § 14, "if the Commission finds, by reason of the number of public investors, amount of trading interest in the securities, the nature and extent of the activities of the issuer, income or assets of the issuer, or otherwise, that such action is not inconsistent with the public interest or the protection of investors." *Id.* at 568 (codified at 15 U.S.C. § 78l(h)).

In 1966, the SEC amended Rule 3a12–3. Although preserving much of the 1935 version of the rule, the SEC withdrew the exemption from § 14 and § 16 for securities of foreign private issuers with signifi-

---

**3.** The current version of Rule 3a12–3 provides that "[s]ecurities registered by a foreign private issuer, as defined in Rule 3b–4 (§ 240.3b–4 of this chapter), shall be exempt from section[] 14(a) ... of the [Exchange] Act." 17 C.F.R. § 240.3a12–3(b). The term "foreign private issuer" is defined as

> any foreign issuer other than a foreign government except an issuer meeting the following conditions:
> (1) More than 50 percent of the issuer's outstanding voting securities are directly or

indirectly held of record by residents of the United States; and
(2) Any of the following:
(i) The majority of the executive officers or directors are United States citizens or residents;
(ii) More than 50 percent of the assets of the issuer are located in the United States; or
(iii) The business of the issuer is administered principally in the United States.
17 C.F.R. § 240.3b–4(c) (2004).

cant ties to the United States.[4] Registration of Foreign Securities, 30 Fed.Reg. 14,737, 14,73 8–39 (Nov. 27, 1965). The SEC adopted this amended rule after conducting a study in which the Commission

[considered] the extent of the trading market for foreign securities in the United States, the disclosure and reporting requirements and practices in many of the countries whose issuers have securities traded in the United States, the requirements of many leading foreign stock exchanges, and the nature of the information presently furnished to the Commission by foreign issuers having securities registered under the Securities Act of 1933, having securities listed on a national securities exchange, and those for whose securities ADR's [American Depository Receipts] have been issued.

*Id.* The Commission has amended Rule 3a12–3 since 1966. *See, e.g.,* Exchange Act Release No. 16,371, 1979 WL 169934, at *10 (Nov. 29, 1979). Nevertheless, Schiller focuses on the 1966 version of the rule, which he characterizes as "the current version of the relevant exemption."[5]

As noted above, Schiller does not appeal the district court's determination that Tower is a foreign private issuer for purposes of Rule 3a12–3 but rather challenges the validity of Rule 3a12–3 itself. In our opinion, this challenge consists of both a substantive and procedural component. Schiller argues that in light of § 12(h), the Commission was unable to justify Rule 3a12–3—what Schiller refers to as a "blanket exemption" from the proxy solicitation rules—because such an exemption exceeds the Commission's authority. Schiller also argues that even if the Commission could have provided an adequate justification for Rule 3a12–3, it did not. Specifically, Schiller contends that the last time the rule was substantively amended, in 1966, the Commission failed to comply with § 12(h)'s requirements, including the requirement that the Commission make a finding that an exemption is not inconsistent with the protection of investors.

## I. Two Preliminary Issues

■ We begin our analysis of Schiller's claims by noting that our authority to review the Commission's adoption of Rule 3a12–3 does not derive from the Securities Exchange Act but rather from the Administrative Procedure Act ("APA"). To be sure, § 25 of the Exchange Act provides for judicial review of rules promulgated pursuant to §§ 78f, 78i(h)(2), 78k, 78k–1, 78o(c)(5) or (6), 78o–3, 78q, 78q–1, or 78s of Title 15. 15 U.S.C. § 78y(b)(1). This judicial review provision makes no mention,

---

**4.** In particular, the exemption was made inapplicable "if more than 50 percent of the outstanding voting securities are held by United States residents and the business of the issuer is administered principally in the United States or 50 percent or more of the members of the Board of Directors are residents of the United States." Exemption of Certain Foreign Issuers, 31 Fed.Reg. 6705, 6705 (May 5, 1966).

**5.** Presumably because Schiller assumes that the rule was last substantively amended in 1966, his brief makes only a passing reference to the "general exemptive authority" provision that was added to the Exchange Act in 1996. National Securities Markets Improvement Act of 1996, Pub.L. No. 104–290, § 105(b), 110 Stat. 3416, 3424 (codified at 15 U.S.C. § 78mm(a)(1)). Using language similar to that of the two other exemptive authority provisions, the general exemptive authority provision authorizes the Commission to exempt by "rule, regulation, or order, any person, security, or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of this title or of any rule or regulation thereunder, to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors." *Id.*

however, of rules promulgated pursuant to § 3(a)(12)(A)(vii) (codified at 15 U.S.C. § 78c) or § 12(h) (codified at 15 U.S.C. § 78l), the two sections of the Exchange Act that authorize the Commission to create exemptions like Rule 3a12–3. Nevertheless, in the absence of authorization of "special statutory review" under the Exchange Act, there is still "general statutory review" under the APA, *see generally* PETER L. STRAUSS, TODD D. RAKOFF & CYNTHIA R. FARINA, ADMINISTRATIVE LAW 1101, 1104–06 (2003), which authorizes us to review "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704. That our authority to review Rule 3a12–3 derives from the APA and not the Exchange Act is relevant to our analysis of the Commission's arguments, advanced in its amicus brief,[6] for why we should avoid reaching the merits of Schiller's claim.

A. *Statute of Limitations*

The Commission argues that, at its core, Schiller's claim amounts to nothing more than an allegation of a procedural defect in the Commission's adoption of Rule 3a12–3 and that such procedural challenges must be brought within the relevant statutory time period following promulgation of the rule.[7] In support of its argument, the Commission relies upon a line of precedent in the D.C. Circuit making the applicability of statutory limitation periods to claims challenging agency action dependent upon whether the challenge is procedural or substantive in nature. The D.C. Circuit has explained that while substantive challenges to agency action—for example, claims that agency action is unconstitutional, that it exceeds the scope of the agency's substantive authority, or that it is premised on an erroneous interpretation of a statutory term—have no time bars, "challenges to the *procedural lineage of agency regulations*, whether raised by direct appeal, by petition for amendment or rescission of the regulation or as a defense to an agency enforcement proceeding, will not be entertained outside the [time] period provided by statute." *JEM Broad. Co. v. FCC*, 22 F.3d 320, 325 (D.C.Cir.1994). Underlying the statutory limitations period is a concern for the agency's interest in prompt review and the public's settled expectations regarding agency action. *Id.* While an agency's ultra vires or unconstitutional act might outweigh these policy concerns and therefore justify reaching an otherwise time-barred challenge to agency action, a mere procedural defect does not. *Id.* Accordingly, in *JEM Broadcasting*, the D.C. Circuit found that the plaintiff was time-barred from asserting a claim, brought outside of the statutory limitations period, that the FCC's promulgation of certain rules failed to provide for notice and comment rulemaking in violation of the APA.

In the present case, Schiller asserts that his challenge should not be time-

---

**6.** On January 10, 2006, responding to our request, the Commission filed an amicus brief in opposition to Schiller's position. On February 3, 2006, Schiller filed a reply to the Commission's amicus brief.

**7.** Although the Commission does not specify what statute it thinks might impose a time bar in this case, we assume that it has in mind 28 U.S.C. § 2401(a), the six-year "catch-all statute of limitations for federal claims" that we have previously found applicable to procedural challenges to agency action brought under the APA. See *Polanco v. U.S. Drug Enforcement Admin.*, 158 F.3d 647, 652 (2d Cir. 1998). To be sure, § 25 of the Exchange Act also provides that review shall be conducted within "sixty days after the promulgation of the rule," 15 U.S.C. § 78y(b)(1); but that statute of limitations provision only applies if review is sought under § 25 itself, and for reasons already articulated, our review of Rule 3a12–3 must derive from the APA, not from § 25 of the Exchange Act.

barred because it is substantive, not procedural. As noted above, there does indeed seem to be a substantive component to Schiller's claim. Schiller argues that § 12(h) does not authorize Rule 3a12–3, which Schiller refers to as a "blanket exemption" from the proxy rules. However, Schiller's principal argument—that "the SEC failed to comply with the statutory requirement of making a finding"—appears to be inherently procedural. To be sure, Schiller focuses on procedures created by the Exchange Act, not by the APA. But the policy concerns motivating the D.C. Circuit's rule would appear to support barring procedural challenges regardless of what statute creates the allegedly deficient procedure.

■ Ultimately, however, we are under no obligation to resolve the issue of whether Schiller's claim is time-barred. Because defendants failed to include this statute-of-limitations defense in their answer to the plaintiff's complaint, we at least have the discretion, and might even be required under Federal Rule of Civil Procedure §§ 8(c), 12(b), and 15(a), to consider the argument forfeited. *Cf. Day v. McDonough,* —— U.S. ——, 126 S.Ct. 1675, 1684, 164 L.Ed.2d 376 (2006) (holding, in the context of a habeas corpus petition, that it is within the discretion of the courts to either raise a statute of limitations defense on their own motion or to declare such a defense forfeited); *id.* at 1683 (noting that "[u]nder the Civil Procedure Rules, a defendant forfeits a statute of limitations defense, *see* Fed. Rule Civ. Proc. 8(c), not asserted in its answer, *see* Rule 12(b), or an amendment thereto, *see* Rule 15(a)"). Although we requested that the Commission submit an amicus brief concerning the merits of Schiller's challenge to Rule 3a12–3's validity, we did not ask for briefing on the issue of whether Schiller's claim was time-barred, and what briefing the parties did provide of their own accord regarding this issue is scant to say the least. *See Concourse Rehab. & Nursing Ctr., Inc. v. DeBuono,* 179 F.3d 38, 47 (2d Cir.1999) (declining to address argument raised for the first time in an appellate amicus brief). Accordingly, we decline to address this issue.

### B. *Primary Jurisdiction*

■ The Commission also argues that the doctrine of primary jurisdiction requires Schiller to have brought his challenge first to the Commission before proceeding to the district court. Even assuming that the issue of primary jurisdiction is one that we can raise on our own motion, *see Pharm. Research and Mfrs. of Am. v. Walsh,* 538 U.S. 644, 674, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) (Breyer, J., concurring), we do not find the doctrine applicable here.

The Exchange Act does not contain a "primary jurisdiction" provision that would control in this case, although it does provide that "[n]o objection to an order or rule of the Commission, *for which review is sought under [§ 25 of the Exchange Act],* may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so." 15 U.S.C. § 78y(c)(1) (emphasis added). Once again, § 25 does not provide for judicial review of rules promulgated pursuant to any of the Exchange Act sections authorizing the Commission to create exemptions. Thus, cases that involve an organic statute requiring a litigant to bring his claim first to the agency before filing a complaint in court are distinguishable. *See, e.g., City of Peoria v. Gen. Elec. Cablevision Corp.,* 690 F.2d 116 (7th Cir. 1982).

■ Even when primary jurisdiction is not statutorily required, however, courts may still apply the doctrine as a prudential

matter. *See S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 750 (10th Cir.2005) ("Primary jurisdiction is a prudential doctrine designed to allocate authority between courts and administrative agencies."). Although "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956), we have generally considered four factors:

(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(2) whether the question at issue is particularly within the agency's discretion;

(3) whether there exists a substantial danger of inconsistent rulings; and

(4) whether a prior application to the agency has been made,

*Ellis v. Tribune Television Co.*, 443 F.3d 71, 82–83 (2d Cir.2006) (citing *Nat'l Commc'ns Ass'n, Inc. v. AT & T Co.*, 46 F.3d 220, 222 (2d Cir.1995)).

The question in the present case—whether the Commission complied with its statutory mandate in promulgating Rule 3a12–3—does not involve technical or policy considerations within the agency's particular field of expertise but instead simply requires us to engage in an activity—statutory interpretation—that is the daily fare of federal judges. *Cf. Baltimore & Ohio Chicago Terminal R.R. Co. v. Wisconsin Cent. Ltd.*, 154 F.3d 404, 411 (7th Cir.1998) (stating that the doctrine of primary jurisdiction does not extend to pure issues of law). Further, the question presented does not fall particularly within the agency's discretion. For obvious reasons, whether an agency has ignored its statutory mandate is a question for the judiciary, not the agency, to address; this remains true even though in answering the question presented, we might defer to an agency's interpretation of the statute it administers. Because the Commission would normally not be expected to rule on whether it had exceeded its own statutory authority, we likewise do not have to worry about inconsistent rulings. Finally, we note that although the party challenging the agency action (in this case, Schiller) made no prior application to the agency, a fact that would normally weigh against primary jurisdiction, in this case such a fact seems simply irrelevant, given that the question presented is not one that the Commission would be expected to decide. Because three of the four factors weigh against primary jurisdiction in this case—and the fourth turns out to be irrelevant—we conclude that this matter should not be referred to the Commission.[8] We therefore turn to the merits and address Schil-

---

[8]. We recognize that courts have on occasion observed that the agency itself must be joined as a proper party defendant in a judicial proceeding reviewing the validity of an agency rule. *See, e.g., City of Peoria*, 690 F.2d at 119–21; *GTE South, Inc. v. Morrison*, 199 F.3d 733, 743 (4th Cir.1999) ("Congress would not give a court the power to determine the validity of an agency's rules when the agency itself is not a party."). Nevertheless, we have in the past chosen to review the validity of agency rules—including Commission rules—without requiring the agency to be a party to the case. *See, e.g., Feder v. Martin Marietta Corp.*, 406 F.2d 260, 268 (2d Cir.1969); *B.T. Babbitt, Inc. v. Lachner*, 332 F.2d 255, 259 (2d Cir.1964); *cf. United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991) (en banc) (addressing whether the SEC exceeded its statutory authority in promulgating Rule 10b–5 even though the agency was not a party in the underlying federal criminal proceeding involving insider trading). We therefore do not think that the fact that the agency is not a party to the litigation prevents our consideration of the validity of Rule 3a12–3, especially where, as here, the Commission has taken the opportunity to submit an amicus brief defending its actions.

ler's substantive and procedural challenges to Rule 3a12–3.

## II. The Merits

### A. *Substantive Challenge*

■ Schiller's substantive challenge focuses on the common language used in the two Exchange Act sections— § 12(h) and § 3(a)(12)(A)(vii)—granting the Commission authority to create exemptions to § 14(a). Both contain language to the effect that any exemption that the Commission adopts must be consistent with the public interest and the protection of investors. Schiller insists that this language means that the Commission may not sacrifice *any* investor protection, regardless of the public interest an exemption might serve. In essence, Schiller argues that in order to adopt an exemption to the Exchange Act, the Commission must determine that the exemption does not decrease the level of protection afforded investors in the absence of *any* exemptions. Because Rule 3a12–3 decreases investor protection, Schiller argues, it exceeds the Commission's exemptive authority.

Schiller's interpretation finds support in neither the text nor in basic principles of logic. Nowhere does § 12(h) or § 3(a)(12)(A)(iii) purport to establish a minimum acceptable level of investor protection, let alone a level equal to that imaginable in a parallel universe where the securities laws and regulations exist in a form unadulterated by exemptions. Indeed, § 12(h) explicitly provides that in deciding whether an exemption is appropriate, the Commission may consider factors such as "the number of public investors, amount of trading interest in the securities, the nature and extent of the activities of the issuer, [and] income or assets of the issuer." 15 U.S.C. § 78l(h). Had Congress intended to restrain the Commission from adopting exemptions that would sacrifice any investor protection for the sake of other public-interest considerations, then these factors, which clearly are proper considerations for the Commission to take into account, would be entirely irrelevant. Moreover, the fact that § 12(h) provides a non-exclusive list of the factors that might enter the Commission's calculus, as evidenced by the phrase "or otherwise," *id.*, strongly suggests that rather than constrain the Commission's exemptive authority, Congress intended to grant the Commission considerable regulatory discretion in this area. Indeed, when it enacted § 12(h), Congress indicated its understanding that the new section provided the Commission with both "flexibility" and "ample authority to modify, and provide exemptions from, the statutory requirements [of the Exchange Act]." Federal Securities Laws: Legislative History 1869 (Fed. Bar Assoc. Sec. Law Comm., 1983); *see also* LOSS & SELIGMAN, SECURITIES REGULATION 1813 (3d ed. 1989) ("Perhaps of greatest significance . . . is the fact that § 12(h), which Congress accepted just as the Commission drafted it, reflects a recognition that it might be necessary to administer the [Exchange] Act with respect to over-the-counter securities more flexibly than had been necessary for listed securities.").

Additionally, Schiller's reading of the two statutory provisions simply belies simple logic. The practical effect of an exemption—which, after all, renders protections that would otherwise be in force inapplicable with respect to a particular class of securities or issuers—is, everything else being equal, a decrease in the net level of investor protection. Therefore, the prohibition of any decrease in the level of investor protection would at the very least substantially curtail, if not completely eviscerate, the Commission's

exemptive authority.[9] Such an effect is clearly at odds with the congressional intent to grant the Commission flexibility in adopting exemptions. We therefore conclude that the most plausible reading of § 12(h), 15 U.S.C. § 78l(h), and § 3(a)(12)(A)(vii), 15 U.S.C. § 78c(a)(12)(A)(vii), is that the Commission can promulgate an exemption once it has determined that the exemption serves the public interest while at the same time leaving in place adequate investor protections.

### B. Procedural Challenge

■■ The gist of Schiller's procedural challenge is that in promulgating Rule 3a12–3, the Commission failed to follow certain procedures required by § 12(h). In particular, Schiller contends that the Commission was required to make a formal finding that the exemption was not inconsistent with the public interest or the protection of investors. That an agency must engage in reasoned decisionmaking is not by any means a novel proposition. With respect to informal rulemakings— those, like the one that gave rise to Rule

3a12–3, that are not required by the organic statute to be undertaken "on the record"—the APA requires that the agency "incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c); see also Indep. U.S. Tanker Owners Comm. v. Dole, 809 F.2d 847, 852 (D.C.Cir.1987) ("Under the Administrative Procedure Act, when an agency initiates a rulemaking that the governing statute does not require to be undertaken 'on the record,' the agency is nonetheless bound to comply with the requirements for 'notice and comment' rulemaking set out in 5 U.S.C. § 553 (1982)."). The agency must provide such a statement whenever it adopts " 'new rules that work substantive changes ' " or, as the Commission did in the 1966 amendment to Rule 3a12–3, adopt " 'major substantive legal addition[s] ' to prior regulations." U.S. Telecom Ass'n v. FCC, 400 F.3d 29, 34 (D.C.Cir.2005) (quoting Sprint Corp. v. FCC, 315 F.3d 369, 374 (D.C.Cir.2003) and Appalachian Power Co. v. EPA, 208 F.3d 1015, 1024 (D.C.Cir.2000)) (brackets and emphasis in U.S. Telecom Ass'n).[10] We

---

**9.** Schiller suggests that his interpretation would only curtail—not eviscerate—the Commission's exemptive authority because "there are some requirements of rules promulgated under [§ ] 14 from which a foreign private issuer could be exempted without adversely impacting the protections provided investors." As examples, Schiller points to rules regarding the type of information to be furnished to shareholders or the presentation of the information in a proxy statement. In light of the fact that the securities laws seek to protect investors through disclosure of information, we fail to understand how one could limit the application of rules defining the content and form of the information to be disclosed without altering the level of protection afforded investors. But even assuming that one could carry out such an unlikely feat, the fact remains that § 12(h) does not state that the Commission may only create exemptions to certain rules promulgated pursuant to §§ 12(g), 13, 14, 15(d) and 16 but rather

states that the Commission may exempt issuers from the provisions of these sections themselves. See § 15 U.S.C. 78l(h) (citing 15 U.S .C. §§ 78l(g), 78m, 78n, 78o(d), and 78p).

**10.** It is not clear whether an agency must follow APA procedures with respect to that part of an amended rule that does not undergo any change. Cf. United States v. Garner, 767 F.2d 104, 119 (5th Cir.1985) (assuming for the sake of argument that a regulation merely reaffirming prior policy and practice need not conform strictly to § 553(c)'s requirement of a statement of basis and purpose). Nevertheless, we need not, and do not, address this argument because no party has raised it. We assume that when it adopted the 1966 amendment, the Commission did have to follow all APA procedural requirements—including the requirement that the Commission publish a statement of basis and purpose—even with respect to that portion of

have explained that the statement of basis and purpose provision "does not require the agency to supply specific and detailed findings and conclusions of the kind customarily associated with formal proceedings," but rather requires the agency to "publish a statement of reasons that will be sufficiently detailed to permit judicial review." *Nat'l Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 701 (2d Cir. 1975).

Nevertheless, Congress may require an even more detailed statement of basis and purpose, and Schiller claims that Congress did precisely that in enacting § 12(h). Section 12(h) provides:

> The Commission may by rules and regulations, or upon application of an interested person, by order, after notice and opportunity for hearing, exempt in whole or in part any issuer or class of issuers from the provisions of subsection (g) of this section or from Section 13, 14, or 15(d) of this title or may be exempt from Section 16 of this title any officer, director, or beneficial owner of securities of any issuer, any security of which is required to be registered pursuant to subsection (g) hereof, upon such terms and conditions and for such period as it deems necessary or appropriate, *if the Commission finds, by reason of the number of public investors, amount of trading interest in the securities, the nature and extent of the activities of the issuer, income or assets of the issuer, or otherwise, that such action is not incon-*
> *sistent with the public interest or the protection of investors.* The Commission may, for the purposes of any of the above-mentioned sections or subsections of this chapter, classify issuers and prescribe requirements appropriate for each such class.

*Id.* 78 Stat. at 568 (codified at 15 U.S.C. § 78l(h)) (emphasis added). As already noted, prior to Congress's enactment of § 12(h), 15 U.S.C. § 78l(h), in 1964, the Commission's authority to create exemptions to § 14(a), 15 U.S.C. § 78n(a), derived from the combined effect of § 14(a)—the terms of which do not apply to an "exempted security"—and § 3(a)(12)(A)(vii), 15 U.S.C. § 78c(a)(12)(A)(vii), which defines "exempted security" as

> such other securities ... as the Commission may, by such rules and regulations as it deems consistent with the public interest and the protection of investors, either unconditionally or upon specified terms and conditions or for stated periods, exempt from the operation of any one or more provisions of this chapter which by their terms do not apply to an "exempted security" or to "exempted securities."

Section 12(h) enlarged upon the Commission's exemptive authority in § 3(a)(12)(A)(vii) in two principal ways.[11] First, § 12(h) permitted the Commission to act by exemptive order on a case-by-case basis rather than solely by rule or regulation.[12] Commentators have suggest-

---

the foreign private issuer exemption that did not change from 1935 to 1966. Since the Commission prevails even under this assumption, there is no reason to decide whether an agency must follow APA procedures with respect to the reaffirmation of prior policy.

**11.** A third obvious difference between the two sources of exemptive authority is that the authority in § 12(h) is to exempt *issuers* rather than *securities* as in § 3(a)(12)(A)(vii).

However, this "seems of no particular significance" because any exemption with respect to securities can be recast as an exemption with respect to issuers and vice versa. Loss & Seligman, *supra*, at 1812.

**12.** Some have argued that the Commission already possessed the authority to issue exemptive orders and that § 12(h) simply clarified this authority. *See, e.g.,* Richard M. Phillips & Morgan Shipman, *An Analysis of the*

ed that this expansion of the method employed by the Commission to adopt exemptions is § 12(h)'s "primary use." Loss & Seligman, *supra*, at 1814. Second, § 12(h) provided the Commission with the authority to exempt issuers of listed securities from sections of the Exchange Act with respect to which the Commission previously lacked any exemptive authority, regardless of the method used. Prior to the passage of § 12(h), the sections of the Exchange Act that, by their terms, did not apply to "exempted securities" included §§ 7(a), 7(c)(1), 9, 11(d), 12(a), 12(g), 14(a) and 16. *See* Richard M. Phillips & Morgan Shipman, *An Analysis of the Securities Acts Amendments of 1964,* 1964 DUKE L.J. 706, 746 n. 139 (1964). As noted above, § 3(a)(12)(A)(vii) delegated to the Commission the power to determine which securities would be exempt from these provisions. But § 12(h) extended the Commission's exemptive authority with respect to § 13 and the entirety of § 14. In addition, it removed any doubt concerning the Commission's exemptive authority with respect to §§ 15(d) and 16(b).[13]

In drafting § 12(h), however, Congress did not distinguish between the new grant of authority to act by exemptive order and the *expansion* of previously held exemptive authority to act by rule or regulation. Instead, Congress stated that the Commission may act by *either* method to create exemptions from the five listed Exchange Act sections. Because prior to passage of § 12(h) the Commission could already act by rule or regulation to create exemptions from § 14(a), Congress created an overlap between the coverage of § 3(a)(12)(A)(vii) and § 12(h). It is precisely this overlap

that Schiller attempts to exploit to his advantage in this case.

Drawing our attention to the differences in language between § 3(a)(12)(A)(vii) and § 12(h), Schiller urges us to find that § 12(h) requires the Commission, when adopting exemptions to § 14(a), to follow certain procedures that are absent from § 3(a)(12)(A)(vii). According to Schiller, when read in conjunction with § 3(a)(12)(A)(vii), § 12(h) introduces three innovations. First, Schiller contends that the omission of the term "unconditionally" in § 12(h) and the retaining of the phrases "upon terms and conditions" and "for such period as the SEC deems necessary or appropriate" authorizes only exemptions that expire after a stated, "reasonable[ ]" time period. Second, Schiller argues that the added language in § 12(h) requires the SEC to consider three factors: (i) the number of public investors; (ii) the amount of trading interest in the securities; and (iii) the nature and extent of the activities of the issuer, income or assets of the issuer. Finally, Schiller focuses most of his energy on the replacement of the word "deems" in § 3(a)(12)(A)(vii) with the word "finds" in § 12(h), a change that, according to Schiller, requires the Commission to make not simply a mental determination but rather a specific, published finding that an exemption such as Rule 3a12-3 is not inconsistent with the protection of investors.

Even if we were inclined to read § 12(h) in light of § 3(a)(12)(A)(vii), Schiller's reading is not the most compelling interpretation available, let alone the only one.

---

*Securities Acts Amendments of 1964,* 1964 DUKE L.J. 706, 746 n. 140 (1964).

**13.** *See* Phillips & Shipman, *supra,* at 747 n. 141. Before the 1964 Amendments, § 15(d) by its own terms did not apply to "any other security which the Commission may by rules

and regulations exempt as not comprehended within the purposes [of § 15(d) ]." Securities Exchange Act of 1934, § 3, Pub.L. No. 74–621, 49 Stat. 1375, 1379 (1936) (current version codified at 15 U.S.C. § 78o(d) (2000)).

As Schiller himself concedes, the phrase "and for such period that the Commission deems necessary or appropriate" easily incorporates unlimited periods. The all-important phrase "or otherwise" signifies that the three listed reasons for decision are at most merely non-exhaustive illustrations of the types of considerations the Commission might, but is not required to, take into account. Finally, as the Commission points out in its amicus brief, the word "finds" in § 12(h) easily admits of multiple meanings, including not only "to declare" but also "to determine," BLACK'S LAW DICTIONARY 504 (4th ed. rev.1968), which is one of the well-accepted meanings of the word "deems" employed in § 3(a)(12)(A)(vii), BLACK'S LAW DICTIONARY 538 (3d ed.1933).[14] Thus, the more plausible interpretation of § 12(h) is that it means precisely the same thing as § 3(a)(12)(A)(vii): the Commission may create exemptions from § 14(a) unconditionally, provided that it determines that such exemptions are not inconsistent with the public interest and the protection of investors.

More fundamentally, Schiller's reading of the statute reflects a misapplication of basic principles of statutory construction. This is not a case where the more specific statute should govern the more general, see, e.g., Carr v. Marietta Corp., 211 F.3d 724, 734 (2d Cir.2000), for the simple reason that the differences in statutory language that Schiller highlights do not in any meaningful way render § 12(h) more specific than § 3(a)(12)(A)(vii). Schiller's argument gains relatively more traction in light of the rule "requiring a change in language to be read, if possible, to have some effect," Am. Nat'l Red Cross v. S. G., 505 U.S. 247, 263, 112 S.Ct. 2465, 120 L.Ed.2d 201 (1992). However, to make the argument that § 12(h) altered the language of § 3(a)(12)(A)(vii), one must assume that § 12(h) impliedly repealed § 3(a)(12)(A)(vii), and the " 'strong judicial policy disfavoring the inference that a statute has been repealed sub silentio by sub-

14. We also note that, although Congress can certainly require an agency to follow procedures in addition to those mandated by the APA, Congress generally seems to do so with more specific language than that used in § 12(h). One instructive example is the Clean Air Act. "In 1977, Congress—concerned that the Administrative Procedure Act (APA), 5 U.S.C. § 553, did not provide procedures adequate for the complex scientific issues involved in EPA rulemaking—created new procedures for most rulemaking under the Clean Air Act...." Small Refiner Lead Phase–Down Task Force v. EPA, 705 F.2d 506, 518 (D.C.Cir.1983). Congress required the EPA to provide in the rules adopted a "statement of basis and purpose," a phrase that mirrors the language of § 553(c) but for the omission of the qualifiers "concise" and "general." Id. at 519. Congress went on to require that this statement of basis and purpose include specific items that also must be disclosed at the proposed rule stage as well as " 'an explanation of the reasons for any major changes in the promulgated rule from the proposed rule' and 'a response to each of the significant comments, criticisms, and new data submitted ... during the comment period.' " Id. (quoting Clean Air Act § 307(d)(6) (codified at 42 U.S.C. § 7607(d)(6)) (alteration in Small Refiner Lead Phase–Down Task Force)). Similarly, the Federal Trade Commission Act requires that when the Federal Trade Commission promulgates certain rules, the agency's statement of basis and purpose must include "(A) a statement as to the prevalence of the acts or practices treated by the rule; (B) a statement as to the manner and context in which such acts or practices are unfair or deceptive; and (C) a statement as to the economic effect of the rule, taking into account the effect on small business and consumers." 15 U.S.C. § 57a(d)(1); see also Katharine Gibbs Sch. (Inc.) v. FTC, 612 F.2d 658, 661 (2d Cir.1979). Had Congress wished to require the Commission to follow certain specific procedures unique to informal rulemakings involving proposed exemptions to the Securities Exchange Act, we believe that it would have done so with more clarity and specificity than that exhibited in Schiller's reading of § 12(h).

sequent legislation,' *United States v. Shareef,* 634 F.2d 679, 680 (2d Cir.1980), applies with equal force to claims of implied amendment, *St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 787–88, 101 S.Ct. 2142, 68 L.Ed.2d 612 (1981)." *Regan v. Ross,* 691 F.2d 81, 87 (2d Cir.1982). Indeed, " '[i]n the absence of some affirmative showing of an intention to repeal [or to amend a statute], the only permissible justification for a repeal [or amendment] by implication is when the earlier and later statutes are irreconcilable.' " *St. Martin Evangelical Lutheran Church,* 451 U.S. at 788, 101 S.Ct. 2142 (quoting *Morton v. Mancari,* 417 U.S. 535, 550, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)). Because there is no evidence in the statute itself or in the legislative history indicating Congress's intention to amend § 3(a)(12)(A)(vii), we would find that § 12(h) amended that earlier section by implication only if the two provisions are irreconcilable. They most certainly are not, as evidenced by the interpretation that we have adopted.

Nor do we think that our reading of § 12(h)—that it authorizes the Commission to create exemptions from § 14(a) unconditionally, provided that it determines that such exemptions are not inconsistent with the public interest and the protection of investors—runs afoul of the canon of statutory construction that "legislative enactments should not be construed to render their provisions mere surplusage." *Dunn v. Commodity Futures Trading Comm'n,* 519 U.S. 465, 472, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997). The Supreme Court has recognized that the "preference for avoiding surplusage constructions is not absolute." *Lamie v. U.S. Tr.,* 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (citing *Chickasaw Nation v. United States,* 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001)). In the present case, this canon of statutory construction seems

less significant because any surplusage created is not within a single statutory provision but across statutory provisions located in completely different sections of a larger and extraordinarily complex enactment.

In any event, other interpretive rules, where more convincing, can take precedence over general principles of statutory construction. *Cf. Krause v. Titleserv, Inc.,* 402 F.3d 119, 128 (2d Cir.2005) (rejecting argument based on statutory canon of avoiding surplusage because this canon " 'should not take precedence over more convincing reasons' " (quoting *Hakala v. Deutsche Bank AG,* 343 F.3d 111, 116 (2d Cir.2003))). In the present case, the text of the statute strongly suggests that Congress did not intend to amend § 3(a)(12)(A)(vii). In particular, § 12(g)(1), which was added to the Exchange Act along with § 12(h) as part of the 1964 Amendments, provides that its registration requirements do not apply to an "exempted security," that is to say, a security exempted under § 3(a)(12)(A)(vii). *See* Securities Acts Amendments of 1964, Pub.L. No. 88–467, § 2, 78 Stat. 565, 566–67 (1964) (codified at 15 U.S.C. § 78l(g)). Yet, § 12(h) also grants the Commission exemptive authority with respect to § 12(g). *Id.,* 78 Stat. at 568 (codified at 15 U.S.C. § 78l(h)). If, as part of the 1964 Amendments, Congress had intended § 12(h) to impliedly amend § 3(a)(12)(A)(vii), it would not have authorized the Commission to rely upon § 3(a)(12)(A)(vii) to create exemptions from one of the newly added provisions. We do not think that the avoidance of surplusage should outweigh this strong textual evidence of Congress's contrary intent. We therefore conclude that § 12(h), 15 U.S.C. § 78l(h), does not require the Commission to make a formal finding or

follow the other procedures that Schiller advocates.

### C. Whether the Commission Provided Adequate Evidence of Reasoned Decisionmaking

■ Although Schiller's brief is far from clear on the matter, Schiller seems to argue that even if § 12(h) does not require a formal finding, the Commission still must provide reasons for its determination that an exemption is not inconsistent with the public interest or the protection of investors. As explained above, the agency's obligation to engage in reasoned decisionmaking, at least in the context of informal rulemaking, is typically traced to the APA requirement that the agency "incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). Instead of relying upon § 553, however, Schiller appears to invoke § 12(h) of the Exchange Act as an independent source for the requirement that the agency articulate reasons for its actions.[15] We have already determined that § 12(h) does not mandate a statement of reasons any more detailed or specific than that required by § 553. Accordingly, we have no reason to decide the precise contours of a reasoned decisionmaking requirement derived from § 12(h) if the Commission provided an adequate statement of basis and purpose under § 553. We conclude that it did.

■ The adequacy of the Commission's statement in connection with its promulgation of Rule 3a12–3 depends in large part upon what we view as the Commission's statement and what level of detail an adequate statement requires. The answer

to the first question would seem to be obvious. The plain language of the APA is clear that whatever the statement is, it must at least be incorporated into the adopted rule. See 5 U.S.C. § 553(c) (requiring the agency to "incorporate in the rules adopted a concise general statement of their basis and purpose"). Nevertheless, in defining the boundaries of what constitutes the statement, courts have taken a functional approach and expressed a willingness to look beyond the four corners of the agency's adopting release. Although post hoc rationalizations are never permitted, a court reviewing the adequacy of an agency's statement may take into account "materials made public in the course of rulemaking." Citizens to Save Spencer County v. EPA, 600 F.2d 844, 884 (D.C.Cir.1979) (citing Automotive Parts & Accessories Ass'n v. Boyd, 407 F.2d 330, 338 (D.C.Cir.1968) (finding that the statement of basis and purpose should be considered "in the light of the reasons stated by the Administrator's denial of rehearing")); see also Ala. Ass'n of Ins. Agents v. Bd. of Governors of Fed. Reserve, 533 F.2d 224, 236–37 (5th Cir.1976) (stating that in considering the adequacy of the statement of basis and purpose, the reviewing court should take into consideration "extraneous material which may be available to explain the basis and purpose of the agency action"), as amended by Ala. Ass'n of Ins. Agents v. Bd. of Governors, 558 F.2d 729 (5th Cir.1977).

Courts have likewise adopted a functional approach for determining the level of detail required in an adequate statement of basis and purpose. The D.C. Circuit has stated that "[a]t the least, such a statement should indicate the major issues of

---

**15.** Presumably Schiller chose not to rely on § 553 of the APA because it is an obviously procedural requirement that would be subject to the six-year statute of limitations. See Part I, supra (discussing the statute of limitations applicable to challenges to agency rules). Apparently, Schiller determined that his only chance of avoiding the statutory limitations period would be an argument based not on the APA but on the organic statute itself.

policy that were raised in the proceedings and explain why the agency decided to respond to these issues as it did, particularly in light of the statutory objectives that the rule must serve." *Indep. U.S. Tanker Owners Comm.*, 809 F.2d at 852. At the same time, however, that same court has recognized that it "will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Int'l Bhd. of Teamsters*, 735 F.2d 1525, 1531 (D.C.Cir.1984) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

Similarly, in the Second Circuit, we have upheld regulations accompanied by statements of less than ideal clarity. *See N.Y. Foreign Freight Forwarders and Brokers Ass'n, Inc. v. Fed. Maritime Comm'n*, 337 F.2d 289, 296 (2d Cir.1964) (upholding a regulation where the statement explained merely that the rules "have for their purpose the establishment of standards and criteria to be observed and maintained by licensed independent ocean freight forwarders, ocean freight brokers and oceangoing common carriers in the conduct of their business affairs"). And on at least one occasion we have even upheld a regulation with no statement at all where the basis and purpose was obvious. *See Hoving Corp. v. FTC*, 290 F.2d 803, 807 (2d Cir.1961); *see also Ala. Ass'n of Ins. Agents*, 533 F.2d at 236–37 (citing *Hoving* approvingly); *Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705, 710 (D.C.Cir.1977) (citing *Alabama Ass'n of Insurance Agents* approvingly for the same proposition); *Citizens to Save Spencer County*, 600 F.2d at 884 & n. 201 (citing *Tabor* approvingly for the same proposition); *Cal–Almond, Inc. v. U.S. Dep't of Agric.*, 14 F.3d 429, 443 (9th Cir.1993) (citing *Citizens to Save Spencer County*

approvingly for the same proposition). Thus, the caselaw is clear that, taking into account the adopting release as well as any materials or statements that the agency has made public in the course of the rulemaking, we can find a statement adequate if the agency's path of reasoning can be reasonably discerned. In the present case, these principles do not mean that the Commission must demonstrate that Rule 3a12–3 would confer additional protections upon investors or even leave investors with the same level of protection in the absence of the exemption. Rather, based on our reading of the statute, *see* Part II, *supra* (discussing Schiller's substantive challenge), these principles mean that at the most the Commission must indicate that the exemption serves some interest and that it leaves in place adequate investor protections.

Although that requirement is not particularly onerous, the Commission does not give us much to go on. The adopting release accompanying the 1966 Rule is, in the Commission's own words, "fairly brief," and even that characterization is charitable. Nowhere in the adopting release does the Commission provide any reason for adopting a foreign private issuer exemption from § 14(a). The adopting release instead describes the rule that was previously in effect, reports on the amendment adopted, and then explains why the Commission decided not to adopt a sub-section of the amendment, as originally proposed. *See* Exemption of Certain Foreign Issuers, 31 Fed.Reg. 6705, 6705 (May 5, 1966). We reject the Commission's invitation to read the adopting release alongside statements in the legislative history of the 1964 Amendments that purportedly justify the foreign private issuer exemption. As we have already stated, we will not consider anything other than statements made by the Commission in the course of the rulemaking.

But that does not leave us completely in the dark as to Rule 3a12–3's basis and purpose. In 1965, the Commission issued a notice of proposed rulemaking announcing the proposed amendments to Rule 3a12–3 that were adopted later that year. Registration of Foreign Securities, 30 Fed. Reg. 14,737, 14,737 (1965) ("1965 Notice"). The 1965 Notice includes the Commission's underlying rationale for the proposed amendments.

As the 1965 Notice explains, the proposed amendments to Rule 3a12–3 were the culmination of a study, conducted by the Commission, into the state of the foreign securities markets:

> [T]he Commission consulted with representatives of American brokers, dealers, financial analysts, and the principal banks issuing American Depositary Receipts (ADR's) who are interested in foreign securities, and received recommendations from interested domestic and foreign groups. The Commission also studied the extent of the trading market for foreign securities in the United States, the disclosure and reporting requirements and practices in many of the countries whose issuers have securities traded in the United States, the requirements of many leading foreign stock exchanges, and the nature of the information presently furnished to the Commission by foreign issuers listed . . . on a national securities exchange. . . .

*Id.* at 14,738. Importantly, the Commission explained in the 1965 Notice that "[t]he study revealed continuing improvement in the reporting of financial and economic information by foreign issuers." *Id.* The Commission also explained that "[t]his improvement has resulted from changes in foreign corporate laws, stock exchange requirements and increasing voluntary disclosure by the companies themselves." *Id.*

Based on the 1965 Notice, we are easily able to discern the Commission's decision path. In determining whether an exemption from § 14(a) was appropriate, the Commission took into account the available protections for investors in foreign securities—the quality of foreign corporate law, the nature of foreign stock exchange rules, and the amount of information voluntarily disclosed by foreign issuers—which are certainly all relevant considerations. Then, the Commission determined that these protections were adequate in light of the important goal of "maintaining [ ] existing markets in foreign securities," a goal the Commission recognized in the 1965 Notice and that Congress identified in adopting the Securities Acts Amendments of 1964. *Id.* Accordingly, the Commission must have concluded that Rule 3a12–3, 17 C.F.R. § 240.3a12–3, was not inconsistent with the public interest or the protection of investors.[16] *Id.*

### Conclusion

Although perhaps "novel," Schiller's argument is ultimately unpersuasive. Rule

16. Even if the Commission never made the underlying study public—and there is no indication on appeal that it did—we do not think that § 553(c)'s requirements of a "concise general statement of [ ] basis and purpose" would require this additional disclosure. Omitting the underlying study would not hamper our ability to engage in judicial review, which is, once again, the principal purpose of the statement requirement, because the study would certainly be included in the record for review. Moreover, this does not appear to be the type of case where the statement of basis and purpose "leave[s] vital questions, raised by comments which are of cogent materiality, completely unanswered." *United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 252 (2d Cir.1977). And finally, Schiller has never advanced the argument that the Commission's procedure withheld from "interested persons [the] opportunity to participate in the rulemaking." 5 U.S.C. § 553(c).

3a12–3 weathers this storm not because of its impressive longevity. Rather, Rule 3a12–3 survives Schiller's challenge because it was promulgated pursuant to the Commission's statutory mandate. Accordingly, we conclude that Rule 3a12–3 is a valid Commission rule and therefore affirm the judgment of the district court.